**SO ORDERED.**

**SIGNED this 12 day of October, 2006.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CRAIG GABEL, | ) | Case No. 05-11125 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| CRAIG GABEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 06-5139 |
| | ) | |
| DEBORAH SPICER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Debtor-in-possession Craig Gabel filed a complaint under 11 U.S.C. § 363(h)[1] to sell real

_____

[1] All subsequent statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq. This case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 and is therefore governed by the Federal Bankruptcy Reform Act of 1978, as amended.

1

property and oil and gas interests in which he and his estranged common law wife, Deborah Spicer, are tenants in common. Ms. Spicer opposes selling the real estate and oil property under § 363(h) because she believes the property can be divided in kind and that she can operate the property once it is equitably divided in the course of hers and Gabel's pending divorce proceeding. Gabel appeared at the October 2, 2006 trial by Mark J. Lazzo and Ms. Spicer appeared by William H. Zimmerman, Jr. After carefully considering the evidence presented and the controlling law, the Court is ready to rule in accordance with Fed. R. Bankr. P. 7052.

**Jurisdiction**

Gabel's application to sell this jointly owned property is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N) and (O) and this Court has subject matter jurisdiction under 28 U.S.C. § 157(b)(1) and § 1334.

**Procedural Setting**

A brief procedural history is necessary. Gabel filed his voluntary chapter 11 petition on March 10, 2005. Gabel's plan of reorganization dated October 25, 2005 contemplates the partial liquidation of rental properties to fund his plan and pay claims. His plan has yet to be confirmed. The current adversary proceeding was commenced March 3, 2006 after Spicer objected to Gabel's efforts to liquidate the real estate.

On November 18, 2005, Gabel filed an adversary proceeding against Virgina Snyder (the "Snyder Adversary")[2] to recover certain fraudulent transfers of real estate made to her prepetition. All five of the properties Gabel sought to recover are part of the subject matter of this adversary proceeding. On February 24, 2006, Gabel filed a motion to amend his complaint to add defendants

---

[2] *Craig Gabel v. Virginia Snyder, et al.*, Adv. Pro. No. 05-5810 (Bankr. D. Kan.).

2

Elizabeth Labore and Clyde Smith, alleging that Snyder had conveyed two of the properties to them.[3] Then, Gabel filed a further motion to amend his complaint in the Snyder adversary to add Spicer as a defendant, seeking essentially the same relief he seeks in the instant matter.[4] On June 6, 2006, this Court ordered that the claims against Snyder, Labore, and Smith be bifurcated from the claims against Spicer and set them for trial on June 14.[5] At the June 14 trial, Gabel orally moved to dismiss his claims against Labore and Smith without prejudice.[6] The Court then conducted a trial on the claims against Snyder and disposed of same by a written memorandum opinion and entry of judgment on August 16, 2006.[7] By a separate order entered in the Snyder Adversary, the claims against Spicer were dismissed.[8] Those claims are identical to what Gabel has pleaded here and are fully disposed of in this Memorandum Opinion.

**Findings of Fact**

Gabel and Spicer lived together as husband and wife for over twenty years. During that time, and particularly beginning in 1993, Gabel acquired in his name a series of "low-end" residential rental properties located south of downtown Wichita. Gabel also acquired working interests in two oil and gas leases. Gabel also operated a series of restaurants in the same general neighborhood as the rentals. As he articulated at trial, Gabel intended that the oil and gas properties would be a "mid-

---

[3] Snyder Adversary, Dkt.12.

[4] *Id.*, Dkt. 14.

[5] *Id.,* Dkt. 29.

[6] *Id.,* Dkt. 40.

[7] *Id.,* Dkt. 45 and 46.

[8] *Id.,* Dkt. 54.

3

term" investment that would supplement his "short-term" investment in the restaurants and allow him to pay off any debt on the rental properties that would serve as "long-term" investments. Spicer assisted Gabel in the management of the restaurants as well as the rentals.

As the record in the Snyder Adversary reflects, in early 2002, Gabel and Spicer decided to terminate their relationship.[9] Gabel established a series of partnerships to hold certain of the rentals and provided that he would hold 70 per cent of the partnerships and Spicer would hold 30 per cent. She, in turn, executed a series of agreements in the partnerships that authorized Gabel to sell the partnership properties on behalf of the partnerships. However, after Spicer filed a divorce petition in Sedgwick County District Court, Gabel conveyed the partnership properties to his girlfriend, Teresa Linker, in exchange for notes and mortgages on them. He also held deeds from Linker in escrow as a means of enforcing the mortgages. Upon discovering these transfers, Spicer took further action in state court to avoid the transfers to Linker and sought appointment of a receiver for the properties. After much wrangling in state court, Gabel filed his chapter 11 case on March 10, 2005. Gabel's and Spicer's divorce case remains pending, notwithstanding this Court having granted stay relief on March 2, 2006 to enable that matter to be tried to a conclusion.[10] The Court is aware that a trial on "financial matters" is currently scheduled for October 12, 2006.[11]

As a matter of Kansas law, the commencement of the divorce case created a "marital estate," consisting of all the property acquired by Gabel and Spicer during their marriage. KAN. STAT. ANN. § 23-201(b) (2005 Supp.) provides that each party to the marriage to be dissolved holds a "common

---

[9] *Id.*, Dkt. 45 at 11.

[10] Case No. 05-11125, Dkt. 160.

[11] *In camera* teleconference with Hon. James Fleetwood, District Judge, Sedgwick County, October 3, 2006, as reported to the parties at trial that day.

4

ownership" in the marital property and that the extent of each party's respective interest is to be determined by the domestic court judge in accordance with KAN. STAT. ANN. § 60-1610(b)(1) (2005). That statute empowers a state district judge to divide the real and personal property of the parties after consideration of various circumstances, including the parties' respective income, ages, duration of the marriage, dissipation of assets, the tax consequences of such transfers, and the like.[12] The division may be accomplished in kind, by awarding property to one party and cash to the other, or by ordering a sale of all the property and dividing the proceeds. Thus, at the time of the commencement of this bankruptcy case, the debtor Gabel had a separate interest in the marital property, the extent of which remains to be determined in the divorce proceeding by the state court.

On October 25, 2005, the debtor proposed a plan of reorganization based upon a sale of the properties, payment of secured claims and sale costs, and a division of the remaining proceeds in accordance with whatever the domestic court might order.[13] Spicer opposed that plan, as well as Gabel's motions for sale of the properties, preferring to have her respective property interests determined by the domestic court in hopes that the court will divide the properties and allow her to retain some or all of the properties. Gabel brought this adversary proceeding to effect a sale of the properties under § 363(h) and asks that they be reduced to money so that the sale proceeds can be divided in the divorce case. According to Gabel, the interests of the estate would be furthered by selling these properties and paying the claims secured by them. Many of the rental properties are vacant and deteriorating and Gabel lacks the income or ability to maintain them. Similarly, there is outstanding work to be done on the oil and gas properties and Gabel is without funds to pay for

---

[12] KAN. STAT. ANN. § 60-1610(b)(1).

[13] Case No. 05-11125, Dkt. 83.

5

that, resulting in the wells being shut-in. Both the real estate and oil and gas are subject to various code and regulatory violations and penalties in addition to the ongoing deferred maintenance liabilities.

Because the divorce case and the attendant property division has yet to be concluded, this Court cannot determine the degree and extent of Gabel's interests in the property. This inability seriously impedes plan confirmation. Section 363(h) gives this Court the power to determine that partition of some or all of these interests in kind is impracticable and that the property should be sold under § 363. The domestic court may then allocate the proceeds between Spicer and Gabel.

The rental properties consist of eighteen (18) houses, all of which are single-family residences. There are, in addition, six (6) oil and gas leases. All are listed in the pretrial conference order.[14] The Court heard exhaustive evidence concerning the relative condition of each house and how much it would cost to return each house to rentable condition. It appears that most of the houses have been disconnected from utilities and are subject to numerous housing code violations that will necessitate city inspection before re-letting them. Without detailing what repairs are necessary on a house by house basis, the Court is persuaded by the testimony of Brad DuPont, a Wichita property manager and developer who owns or operates some 600 similar properties, that the cost of renovating the houses may well outstrip their market value today by as much as 150 per cent. Gabel testified that, on the advice of his counsel and his realtor, Larry Underhill, he "emptied out" the rentals in anticipation of a sale sometime after the bankruptcy was filed.[15]

---

[14] Dkt. 29 at 6.

[15] According to Gabel, Spicer had originally agreed that the properties should be sold only to later change her mind.

6

The photographs introduced into evidence show these rentals to be in precarious condition at best. Several have been vandalized and others show needs for roof, wall and basement repair. None appears to have been even marginally maintained. DuPont estimated that the rentals, if sold at auction, would bring approximately $270,000.[16] He testified that the most economical way to deal with these properties would be to sell them at an open auction. He says that there is a strong market for these sorts of properties among investors who purchase and restore them, either to hold as rental investments or for resale. The total of his estimated repairs for these rentals is $207,000 on the low side and, according to him, could amount to twice as much as their sale value.[17]

Ten of the eighteen houses are subject to mortgages. According to the schedules filed in this case, Gabel's secured creditors are owed about $55,000. In addition, some $70,000 in ad valorem property tax encumbers the various tracts. Three of the tracts were recovered by Gabel from Virginia Snyder pursuant to the prior adversary proceeding[18] Another two of the tracts are currently occupied, rent-free, by would-be purchasers who signed contracts with Underhill when he marketed the properties for Gabel in January of 2006. When Spicer objected to those sales, the closings were placed on hold. According to Gabel, these occupants remain ready, willing, and able to complete these sales and, if the instant complaint is granted, he will attempt to close with those purchasers.

Gabel estimated that the value of the oil and gas interests would bring about $144,000 at the monthly Evenson oil and gas auction in Wichita. He also testified that there are numerous

---

[16] Ex. 36.

[17] DuPont's estimated rehabilitation costs were based on what it would cost him (with his own employees) to renovate the properties. He indicated that these costs would be considerably higher if the renovations were contracted out to third parties.

[18] Snyder Adversary, Dkt. 45.

7

outstanding bills to be paid on these wells, including pumping, equipment, and maintenance. Moreover, Gabel stated that the wells are subject to a number of regulatory citations by the Kansas Corporation Commission, all of which will be costly to remediate. Gabel states that he has no funds to pay for these needed repairs. At present, the wells are shut-in, producing no income.

Deborah Spicer stated that she is a high school graduate who is presently employed on an hourly basis in Wichita, making approximately $25,000 a year. Spicer claims a strong emotional attachment to the rentals and sincerely believes that were she awarded them by the domestic court, she could utilize the oil revenues to refurbish them and place them back on the rental market. She formerly assisted with the operation of the rentals during her marriage to Gabel, collecting rents, dealing with tenants, and performing routine maintenance associated with rentals. She does not, at present, have a source of funding any repairs beyond her wages and the potential to borrow. Spicer believes she can "make wise decisions" about the management of the rental properties. She is strongly opposed to this Court ordering the houses to be sold because she intends to rely on these rentals as a part of her future financial security.

According to the credible testimony of Darrell Duncan, C.P.A., a sale of the rental properties and the oil and gas interests would yield a capital gain of about $177,780 which, based on Gabel's income as indicated on his 2004 federal tax return, would result in a capital gains tax of about $40,753.[19] This is the only year's income for which Mr. Duncan made the analysis. Debtor placed in evidence his 1996-1998 returns, but it is unclear whether his 2005 return is complete. Nor is there evidence of what debtor expects to generate in income in 2006. The Court recognizes that because of these gaps in the record, the capital gains tax consequences of selling the property could be

---

[19] Ex. 36.

greater or lesser, depending on when the sale occurs and what Gabel's other income amounts to. Spicer opposes the sale because it will trigger capital gain. According to Mr. Duncan, were she to be awarded some or all of these assets in the divorce case, that transfer would not be taxable. But, KAN. STAT. ANN. § 60-1610(b)(1) provides the domestic court judge with virtually unlimited discretion to consider the impact of these taxes in allocating the property or its proceeds. If a sale occurred, that court could certainly "equalize" the impact of any taxes by adjusting the proration of the proceeds among the parties.

### Analysis

In seeking approval under § 363(h) to sell both his interest and the so-far undetermined common interest of Spicer, Gabel had the burden to prove that (1) partition of the properties in kind is impracticable; (2) the sale of the estates undivided interests would realize significantly less than a sale free of the co-owner's interest; (3) the sale of the property free and clear of Spicer's interest benefits the estate and that benefit outweighs any detriment to Ms. Spicer; and (4) the property to be sold is not used for the production, transmission, or distribution of electric or gas energy. The fourth element of proof is stipulated by the parties.[20]

Many courts hold that the division in kind of single-family residential property is impracticable per se.[21] These cases most often arise in the context of complaints to sell a marital

---

[20] Dkt. 29 at 3, ¶ 6D.

[21] *See e.g., In re Reed*, 940 F.2d 1317, 1323 n. 8 (9th Cir. 1991) (Partition of a residence was "obviously not possible."); *In re Van Der Heide*, 164 F.3d 1183 (8th Cir. 1999); *In re Jenkins*, 347 B.R. 77, 84-85 (Bankr. N.D. Ill. 2006); *In re Harlin*, 325 B.R. 184, 190 (Bankr. E.D. Mich. 2005); *In re Zeigler*, 320 B.R. 362 (Bankr. N.D. Ill. 2005); In *re Kelley*, 304 B.R. 331, 338 (Bankr. E.D. Tenn. 2003); *In re Roswick,* 231 B.R. 843, 858 (Bankr. S.D.N.Y. 1999) (jointly owned cooperative apartment used by debtor and nondebtor spouse as single family residence could not be physically partitioned); *In re Griffin*, 123 B.R. 933, 935 (Bankr. S.D. Fla.

9

homestead that has been apportioned among divorcing spouses. This situation is somewhat different as none of the properties here is the divorcing couple's marital residence. With respect to the real estate, each party has an undetermined, undivided common interest in each house.[22] Under KAN. STAT. ANN. § 60-1610, the domestic court clearly has the power to divide the properties by allocating some of the rental units to each party. This Court questions whether it has a similar partition-in-kind power. Unlike the Kansas statute, § 363(h) does not specifically empower this Court to apportion the properties in kind, only to allow them to be sold free and clear of the co-owner's interests in them.[23] With respect to the real estate, it is indeed impracticable to partition the rental properties in kind.

The oil and gas interests are easily partitioned. Although the Court received no evidence concerning division orders or what share of these wells Gabel and Spicer owned, working interests are commonly held by more than one person, each of whom as a matter of law is a separate owner of separate property rights. There is no reason why these working interests cannot be divided in

---

1991).

[22] *See In re Woolston*, 147 B.R. 279 (Bankr. M.D. Ga. 1992) (Chapter 7 trustee was entitled to sell mobile home park where mobile home park was owned by debtor partners; partition of mobile home park was impracticable.).

[23] The Court notes that several bankruptcy judges have *implied* a partition power from the provisions of § 363(h)(1). Such a case is *In re Belyea*, 253 B.R. 312, 314 (Bankr. D.N.H. 1999), in which the court, citing several other cases, states that "if partition is 'practicable,' the Court is without authority to approve a sale of jointly owned property under section 363(h). By implication, then, the Court has the authority to permit partition of the property jointly owned by the debtor third party." This Court respectfully disagrees. Making "impracticability" a condition precedent to selling property free and clear of a common tenant's interest is not the same as expressly granting the bankruptcy courts power to partition where doing so would be "practicable." Absent a specific grant of such power over a non-debtor's property interests, this Court questions what jurisdiction it would have to effectuate an in-kind partition, were one practicable here.

10

kind by the domestic court.

Numerous courts take judicial notice that the sale of the estate's undivided interest in real property would realize significantly less than a sale free of the co-owner's interest.[24] This Court joins those courts. It is difficult to see that any investor would be interested in investing in a rental property, part of which was owned or controlled by a stranger. Mr. DuPont expressed this opinion as well.

Finally, the Court must balance the benefit to the estate of a sale of all the rentals against the detriment to Ms. Spicer of such a sale. The Court certainly recognizes Ms. Spicer's commitment and devotion to owning and managing these properties and does not doubt her sincerity or good faith in that regard.[25] The Court is also sympathetic to Ms. Spicer because it is apparent that Gabel did everything in his power to convey these properties out from under her. The properties have stood vacant and deteriorated, to the detriment of both parties. The Court also recognizes that, for whatever reason, the divorce case and various allied civil matters have languished for more than four years, without any resolution.

Yet, the benefits to the estate of a sale free and clear are substantial. Gabel lacks the ready funds to maintain these properties in which there remains a substantial equity. The sale of the rentals, and eventual division of the net proceeds by the domestic court is by far the most efficient way to divide these assets and complete the financial matters portion of the divorce. The properties

---

[24] *See In re Griffin*, 123 B.R. 933, 935-36 (Bankr. S.D. Fla. 1991); *In re Jenkins*, 347 B.R. 77, 84-85 (Bankr. N.D. Ill. 2006).

[25] The Court has taken into account the non-economic factors that operate as a detriment to Ms. Spicer, as it is authorized to do. However, those non-economic factors do not tilt the balance in her favor. *See In re Roswick*, 231 B.R. 843 (Bankr. S.D.N.Y. 1999); *In re Persky*, 893 F.2d 15, 20-21 (2nd Cir. 1989).

11

Case 06-05139    Doc# 34    Filed 10/12/06    Page 11 of 14

have sizeable tax debt against them and interest continues to accrue, further whittling away at the estate's equity. The secured creditors holding mortgages on these properties also continue to accrue interest, and other expenses. As the properties deteriorate and become subject to more city housing code violations, not only does their intrinsic value drop, but administrative claims increase to the further disadvantage of the estate. Finally, as winter approaches and the properties remain unoccupied, the question of adequate protection and how it can be paid for looms ever larger.

The Court also questions how Ms. Spicer can hope to rehabilitate these properties on her wages. Even if the entirety of the oil interests were set over to her in the divorce case, the wells are inoperative at this point and apparently require substantial investment to return to production, assuming that all the regulatory problems with them are resolved with the Kansas Corporation Commission. Ms. Spicer did not indicate any particular source of funds that would allow her to accomplish those aims.

Nothing precludes the domestic court from considering all of the factors that are listed in KAN. STAT. ANN. § 60-1610(b)(1) in dividing up the proceeds of the rentals. Indeed, that court may well recognize and account for Gabel's prepetition conduct in transferring the properties to Teresa Linker,[26] in allowing them to stand vacant and deteriorate, and in triggering the capital gains on their sale. This Court believes that "making a just and reasonable division of property" will be furthered by the reduction of that property to cash.

The Court notes that Ms. Spicer may be better served by a cash award which she can invest for her future benefit than by retaining some or all of the houses in kind. To the extent that she has claims in the bankruptcy case, she will be far better served by the reduction of Mr. Gabel's portion

---

[26] *See* Snyder Adversary, Dkt. 45.

12

Case 06-05139    Doc# 34    Filed 10/12/06    Page 12 of 14

of the properties to cash than by his retention of the properties in kind if he is unable to maintain whatever the domestic court sets over to him. A prompt sale of these properties will stop the bleeding. The Court can only conclude that the benefits to the estate of a sale of the rentals free of the co-owner's interest outweigh the detriment to Ms. Spicer. Ms. Spicer also retains the absolute right to bid in any or all of the properties at sale under § 363(i).

Therefore, the Court concludes that judgment should be entered for the debtor in possession, Craig Gabel, GRANTING him the right under § 363(b), (f) and (h), and upon filing the appropriate motion and notices, to sell the rental properties free and clear of Deborah Spicer's undivided interest in them, with all of the net proceeds to be retained in a special debtor in possession account and not expended for any purpose absent the further order of this Court. Furthermore, this Court defers to the District Court of Sedgwick County, Kansas, Domestic Division, as to the determination of Gabel's and Spicer's respective interest in the proceeds of the sales. To the extent that court determines Gabel's interest in the cash proceeds, said proceeds shall be deemed property of his estate. The balance of the proceeds shall be deemed Deborah Spicer's sole and separate property and shall be distributed to her accordingly.

Judgment is DENIED concerning the oil and gas interests which, as set out above, may easily be apportioned among the parties in kind.

In closing, this Court awaits the determination of the domestic court concerning the in-kind allocation of the oil and gas interests and the division of proceeds from the sale of the rental properties. Nothing in this memorandum and order should be read as limiting in any respect the broad discretion of the domestic court in considering the many factors listed in KAN. STAT. ANN. § 60-1610(b)(1) in dividing the proceeds of the rental properties.

A Judgment on Decision will issue this day.

# # #

14